FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 16, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

TONI S.,[1]

                    Plaintiff,

         v.

CAROLYN COLVIN, Acting
Commissioner of Social Security,[2]

                    Defendant.

No.    2:24-cv-00191-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS**

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Carolyn Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), she is hereby substituted for Martin O'Malley as the defendant.

Due to fibromyalgia, carpal tunnel syndrome, obesity, depression, anxiety, post traumatic stress disorder (PTSD), a thyroid condition, asthma, and irritable bowel syndrome (IBS), Plaintiff Toni S. claims that she is unable to work fulltime and applied for disability insurance benefits and supplemental security income benefits. She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed the medical opinions of record, and that the ALJ erred in his consideration of Plaintiff's subjective complaints. As is explained below, the ALJ erred in his consideration of the medical opinions and failed to develop the record properly by obtaining medical expert testimony. This matter is remanded for further proceedings.

## I.    Background

On June 2, 2021, Plaintiff filed an application for benefits under Title 2, and on June 9, 2021, she filed an application for benefits under Title 16, with both claiming disability beginning January 1, 2016, based on the mental and physical impairments noted above.[3] Plaintiff's claim was denied at the initial and reconsideration levels.[4]

---

[3] AR 236-237, 238-244, 282.

[4] AR 119, 124, 132, 135.

1    After the agency denied Plaintiff benefits, ALJ John Dowling held a

2 telephone hearing in September 2023, at which Plaintiff appeared with her

3 representative and testified.[5]  A vocational expert also appeared and testified.[6]

4    Plaintiff testified that she is 36, single, and lives with her 10-year-old

5 daughter.[7] She said that she can drive and that she had completed high school and

6 1 ½ years of college but did not have a degree or any vocational training.[8] She said

7 that she last worked at Fred Meyers for 20-40 hours a week as a deli worker and a

8 cook.[9] She had to lift 30 to 40 pounds when working there.[10] Before that she

9 worked at Compass Group as a cashier and food prep at a deli inside Boeing's

10 cafeteria.[11] She said that she would work as a cashier, doing food prep, or serving

11 customers, and that the heaviest she lifted was 40 pounds.[12] Prior to that, she

12

13

14

_____

15

16 [5] AR 37-61.

16 [6] *Id.*

17 [7] AR 2.

18 [8] AR 42-43.

19 [9] AR 43.

20 [10] AR 44.

21 [11] AR 44.

22 [12] AR 44-45.

23

DISPOSITIVE ORDER - 3

worked at Orange Julius, as an assistant manager which meant she opened and closed and made smoothies.[13] She lifted 30-40 pounds as part of the job.[14]

Plaintiff said she left her last job because she was having trouble lifting and carrying things due to carpal tunnel syndrome, and was not able to lift the pans and do the work.[15] She said that the pans became too heavy to lift and she was dropping them.[16] Plaintiff said she had two surgeries – a carpal tunnel release and an ulnar nerve release – but they were not effective and she still had pain.[17] Plaintiff said that her doctors attributed her present pain to fibromyalgia and that she gets tingling in her hands, and will lose feeling in her hands if they are above her head for very long.[18] She said she is 5'9" and weighs 350 pounds.[19]

When asked to identify her biggest obstacle to working, Plaintiff said her pain levels were a constant 7/8 of 10 without medication and 4 of 10 with medication.[20] She takes hydrocodone, tramadol, and Sevilla and the medications

---

[13] AR 45-46.

[14] *Id.*

[15] AR 46.

[16] *Id.*

[17] *Id.*

[18] AR 46-47.

[19] AR 47.

[20] *Id.*

make her tired, drowsy, dizzy, and lightheaded.[21] Plaintiff said most of her pain is in her knees, hips, and lower back and that it limits her from bending, which makes it difficult for her to bathe, dress, and use the toilet.[22] She said it is hard to stand still and she could only stand at the sink to do dishes for 10 to 15 minutes.[23] Plaintiff said that she lays down through the day in blocks of one to three hours.[24] She said that she has good days and bad days and that on a bad day she can't sit still and will be constantly moving around trying to get comfortable.[25] She also said that on some days she will just lay still because the pain radiates into her back and it hurts to move.[26] She said that on a good day she can stand at the sink for 10-15 minutes and can do chores around the house like sweeping and mopping but that she has to rest between tasks.[27]

Plaintiff said her second biggest obstacle to working is her mental health, and that because of her PTSD and anxiety she cannot go out in public most days

---

[21] AR 47-48.

[22] AR 48.

[23] *Id.*

[24] AR 49.

[25] *Id.*

[26] *Id.*

[27] AR 49-50.

and finds it hard to leave her home.[28] She said the thought of leaving home makes her shake and vomit.[29] She said that at the store she does not want to be touched by other people and will go during work hours when it is less crowded, because if there are too many people she will get tunnel-vision and feel claustrophobic.[30] She said that she usually has to leave before she can get everything on her list.[31] Plaintiff said if she has a panic attack in the grocery store she will have to talk herself out of it or have her daughter talk her out of it and then she will leave.[32]

Plaintiff said she has tried going on three dates but they end badly because she will sit with her back to the crowd and feel people are watching her and talking about her.[33] Plaintiff said her counselor told her she is scared that her ex-husband is in the crowd.[34] She said that other than those 3 dates she only socializes over the phone and the only places she will go to are doctor's offices and the DSHS office.[35] She said that when she leaves home she tries to have her daughter with her but

---

[28] AR 50.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] AR 51.

[33] *Id.*

[34] *Id.*

[35] AR 52.

1   will also go out when her daughter is at school.[36] She said that it is easier for her

2   when her daughter is with her because she is autistic and will keep Plaintiff

3   focused and on-track.[37] Plaintiff said that she can drive for about 30 minutes before

4   she gets too drowsy but that her doctors are trying to find the right pressure for

5   her CPAP machine.[38] Plaintiff said that if a drive is over 30 minutes there is a

6   medical transportation that takes her because her knees will lock up when

7   driving.[39] She said that 3-4 times a week she will not be able to leave home and

8   that she has had to cancel appointments in the past but is now usually able to

9   schedule a phone appointment.[40]

10        Plaintiff said that since switching to hydrocodone she can sleep for 4-5 hour

11   blocks of time and then sleep another 2-3 hours after a break, but she has night

12   terrors and nightmares 3-4 times a week.[41] She said she has little energy during

13   the day and sleeps to escape pain.[42] Plaintiff said she can concentrate for about an

---

[36] *Id.*

[37] *Id.*

[38] AR 52-53.

[39] AR 53.

[40] *Id.*

[41] AR 54.

[42] *Id.*

1  hour and likes to write, watch movies, and listen to music, but said she needs some

2  background noise to keep background chatter in her mind away.[43]

3      Plaintiff said she feels guilt at being a bad mother because she left her

4  husband and some of her daughters live separate from her.[44] She also has guilt

5  that she engages in cutting daily.[45] Plaintiff said she has shoulder wounds that she

6  will scratch open and also at times will drag a key across her skin.[46] Plaintiff said

7  she thinks about suicide at least every other day.[47]

8      After the hearing, the ALJ issued a decision denying benefits.[48] The ALJ

9  found Plaintiff's alleged symptoms were not entirely consistent with the medical

10  evidence and the other evidence.[49] As to medical opinions, the ALJ found:

11      • The opinions of state agency evaluators Norman Staley, MD, and

12        Merry Alto, MD, to be partially persuasive.

13

14

---

15  [43] *Id.*

16  [44] AR 54-55.

17  [45] AR 55.

18  [46] *Id.*

19  [47] *Id.*

20  [48] AR 14-36.  Per 20 C.F.R. §§ 404.1520(a)-)g), 416.920(a)–(g), a five-step evaluation

21  determines whether a claimant is disabled.

22  [49] AR 23-25.

23

- The opinions of state agency evaluators Kent Reade, PhD, and Matthew Comrie, PsyD, to partially persuasive.

- The opinions of consultative examiner Thomas Genthe, PhD, to be not persuasive.

- The opinions of consultative examiner Nina Flavin, PhD, to be partially persuasive.

- The opinions of Morgan Scott Fife, MD, to be partially persuasive.

- The opinions of George Ankuta, PhD, to be partially persuasive.

- The opinions of Frank Beck, PA-C, to be not persuasive.[50]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2020.

- Plaintiff had not engaged in substantial gainful activity since January 1, 2016, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: fibromyalgia, obesity, depression, anxiety, and PTSD.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments with consideration of Listing 12.04 and 12.15.

---

[50] AR 25-27.

- RFC:  Plaintiff had the RFC to perform light work with the following exceptions:

  She can occasionally climb ramps or stairs but never climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, or crawl; she is limited to low stress work, defined as occasional decision-making required and occasional changes in the work setting; she is capable of occasional interaction with the public.

- Step four: Plaintiff is unable to perform her past relevant work as a cafeteria attendant, food preparation supervisor, and short order cook.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a router (DOT 222.587-038), a marker (DOT 209.587-034), and a silver wrapper (DOT 318.687-018).[51]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[52]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[53] and such error impacted the nondisability

---

[51] AR 19-29.

[52] AR 234.

[53] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

1    determination.[54] Substantial evidence is "more than a mere scintilla but less than a

2    preponderance; it is such relevant evidence as a reasonable mind might accept as

3    adequate to support a conclusion."[55]

### III.    Analysis

5        Plaintiff seeks relief from the denial of disability on two grounds. She argues

6    the ALJ erred when evaluating the medical opinions and that the ALJ also erred in

7    her assessment of Plaintiff's testimony.[56]  As is explained below, the Court

---

[54] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[55] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[56] Plaintiff also argues that the ALJ's finding at step five is flawed as a result of his errors in evaluating the medical opinions and his subjective testimony.

concludes that the ALJ consequentially erred in his evaluation of the medical opinion evidence.

## A.    Medical Opinion: Plaintiff establishes consequential error

Plaintiff argues the ALJ erred in his evaluation of the medical opinions regarding both Plaintiff's mental impairments and physical impairments.[57] Plaintiff argues that the ALJ improperly rejected all or a portion of the opinions of Dr. Genthe, Dr. Flavin, Dr. Fife, Dr. Ankuta, Mr. Beck, Dr. Staley, Dr. Alto, Dr. Reade, and Dr. Comrie without providing more than a vague and conclusory statement in each instance.[58] Plaintiff argues that the ALJ failed to articulate his reasoning and consideration of the factors of supportability and consistency when evaluating the medical opinions. The Commissioner counter argues that the ALJ properly considered the medical opinions and that Plaintiff's argument that the ALJ's reasoning was not properly articulated arrives at that conclusion by engaging in circular logic.[59]

---

[57] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent with and supported by the record. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[58] ECF No. 10.

[59] ECF No. 12.

1    1.    <u>Standard</u>

2        The ALJ was required to consider and evaluate the persuasiveness of the

3    medical opinions and prior administrative medical findings.[60] The factors for

4    evaluating the persuasiveness of medical opinions and prior administrative

5    medical findings include, but are not limited to, supportability, consistency,

6    relationship with the claimant, and specialization.[61] Supportability and consistency

7    are the most important factors,[62] and the ALJ must explain how she considered the

8    supportability and consistency factors when reviewing the medical opinions and

9    support her explanation with substantial evidence.[63] The ALJ may consider, but is

10    not required to discuss the following additional factors: the source's relationship to

11    Plaintiff such as length of the treatment, purpose of the treatment relation and

12    whether the source examined Plaintiff, as well as whether the source had advanced

13    training or experience to specialize in the area of medicine in which the opinion

14

15    _____

16    [60] 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

17    [61] *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)–(5).

18    [62] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

19    [63] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The

20    agency must articulate . . . how persuasive it finds all of the medical opinions from

21    each doctor or other source and explain how it considered the supportability and

22    consistency factors in reaching these findings.") (cleaned up).

23

1  was being given.[64] When considering the ALJ's findings, the Court is constrained to

2  the reasons and supporting explanation offered by the ALJ.[65]

3          2.    <u>Relevant Medical Evidence and Opinions</u>

4          a.    <u>*Dr. Staley*</u>

5          On September 23, 2021, Plaintiff's file was reviewed by state agency

6  physician Norman Staley, MD.[66] Dr. Staley opined that Plaintiff has the ability to

7  occasionally lift and carry up to 20 pounds; to frequently lift and carry up to 10

8  pounds; to stand for a total of 2 hours in an 8-hour day, to sit for up to 6 hours in

9  an 8-hour day; and to push and pull with his lower extremities no more than 10

10  pounds frequently or 20 pounds occasionally.[67] He opined that Plaintiff could never

11  climb ladders, ropes, or scaffolds; could frequently balance; and could occasionally

12  climb ramps and stairs, stoop, kneel, crouch, and crawl.[68] He opined that bilateral

13  handling was limited to frequent due to the residual effects of carpal tunnel

14  syndrome, post-release.[69] Dr. Staley also opined that Plaintiff should avoid

---

[64] Id.

[65] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court review is constrained to the reasons the ALJ gave).

[66] AR 73.

[67] AR 71.

[68] AR 72.

[69] *Id.*

concentrated exposure to extreme cold and even moderate exposure to noise, vibration, fumes, and hazards.[70]

### b.  _Dr. Reade_

On October 18, 2021, Plaintiff's file was reviewed by state agency psychologist Kent Reade, PhD.[71] He opined that Plaintiff does not have limitations in understanding or memory but has limitations in concentration and persistence.[72] He opined that Plaintiff has a mild limitation in the domain of understand, remember, and apply information.[73] Dr. Reader also opined that Plaintiff had a moderate limitation in the following three domains: interact with others; concentrate, persist and maintain pace; and adapt or manage oneself.[74]

### c.  _Dr. Comrie_

On May 6, 2022, Plaintiff's file was reviewed at the reconsideration level by state agency psychologist Matthew Comrie, PsyD.[75] Dr. Comrie opined that there

---

[70] AR 73.

[71] AR 69.

[72] AR 73.

[73] AR 69.

[74] _Id_.

[75] AR 92.

was insufficient evidence to determine Plaintiff's limitations on or before the date last insured.[76]

           d.   <u>Dr. Alto</u>

On May 31, 2022, Plaintiff's file was reviewed by state agency physician Merry Alto, MD. [77]Dr. Alto adopted Dr. Staley's restrictions for lifting, carrying, pushing, and pulling, as well as his postural and manipulative limitations.[78] She opined that with regard to environmental limitations Plaintiff should avoid concentrated exposure to the following: extreme cold,  noise, vibration, fumes, and hazards.[79]

           e.   <u>Dr. Fife</u>

On September 21, 2017, Plaintiff was examined by Morgan Scott Fife, MD.[80] Dr. Fife completed an assessment for the Washington State Department of Social and Human Services (DSHS).[81] Dr. Fife noted that on examination Plaintiff had a

---

[76] AR 92.

[77] AR 96.

[78] AR 94-95.

[79] AR 96.

[80] AR 905-906.

[81] *Id*.

normal gait and station but had a positive Tinel[82] and Phalen[83] sign in the right

and left upper extremities.[84] Dr. Fife opined that Plaintiff had carpal tunnel

syndrome, bilateral upper limbs; and anxiety.[85] Dr. Fife opined that Plaintiff carpal

tunnel syndrome imposed a marked limit on her ability to lift handle and carry.[86]

He also opined that Plaintiff's anxiety had a moderate limitation on her ability to

communicate, understand and follow directions.[87] Dr. Fife opined that Plaintiff's

overall work level was severely limited and that the limitations would continue for

---

[82] The Tinel Sign is a test for peripheral nerve entrapment, which is performed by the examiner tapping firmly with a fingertip throughout the nerve, and it indicates entrapment of the nerve depending on the point at which symptoms are provoked. National Institute of Health, *Hoffmann Tinel Sign*, NCBI Bookshelf (nih.gov) (last viewed November 20, 2024.)

[83] Phalen's test is a test for carpal tunnel syndrome in which an examiner moves a patient's hands and wrists in a series of movements intended to put light pressure on the median nerve in the wrist. Cleveland Clinic, *Phalen's Test: What It Is & How It's Performed* (clevelandclinic.org) (last viewed November 20, 2024.)

[84] AR 905.

[85] *Id.*

[86] *Id.*

[87] *Id.*

1    at least 12 months without treatment.[88] Dr. Fife noted that Plaintiff would be

2    undergoing a carpal tunnel release surgery but opined that in the future Plaintiff's

3    work should be limited to one what did not require exposure to "lots of people."[89]

4         f.    _Dr. Genthe_

5         On October 3, 2017, Thomas Genthe, PhD, examined Plaintiff at the request

6    of DSHS.[90] Dr. Genthe provided a detailed report that included a psychosocial

7    history; medical and mental health treatment history; educational and work

8    history; (absence of) substance abuse and chemical dependency history; description

9    of activities of daily living; clinical findings; diagnosis; medical source statement;

10    mental status examination; and psychometric assessment results for a personality

11    assessment inventory test administered to Plaintiff.[91] Dr. Genthe opined that

12    Plaintiff suffers from bipolar II disorder, with anxious stress; panic disorder;

13    agoraphobia; and PTSD.[92] Dr. Genthe opined that Plaintiff would have a moderate

14    impairment in the following activities: understand, remember, and persist in tasks

15    by following detailed instructions; adapt to changes in a routine work setting; be

16    aware of normal hazards and take appropriate precautions; and set realistic goals

17

18    [88] _Id._

19    [89] _Id._

20    [90] AR 359-369.

21    [91] _Id._

22    [92] AR 362.

23

DISPOSITIVE ORDER - 18

1   and plan independently.[93] Dr. Genthe opined that Plaintiff would have a marked

2   impairment in the following activities: ask simple questions or request assistance,

3   communicate, and perform effectively in a work setting, maintain appropriate

4   behavior in a work setting, and complete a normal workday and workweek without

5   interruptions from psychologically based symptoms.[94] Dr. Genthe opined that the

6   overall severity of Plaintiff's mental impairments was severe, that none of

7   Plaintiff's limitations were due to substance use, that Plaintiff's impairments

8   would last 9-12 months with appropriate treatment, and that vocational training

9   would minimize or eliminate barriers to employment.[95]

10          g.      _Dr. Flavin_

11          On February 16, 2021, Plaintiff's treating medical source Nina Flavin, MD,

12   completed a WorkFirst Medical Disability Form.[96] Dr. Flavin noted that Plaintiff

13   has physical, mental, and emotional issues, and that she has been diagnosed with

14   fibromyalgia, depression, PTSD, and anxiety and that the diagnoses are supported

15   by objective testing.[97] Dr. Flavin opined that Plaintiff's conditions limit her ability

16   to work and explained that "flexible work hours [are] needed given underlying

17   _____

18   [93] _Id._

19   [94] _Id._

20   [95] AR 363.

21   [96] AR 369-373.

22   [97] AR 369.

23

medical condition."[98] She also opined that Plaintiff would be limited to working 21-30 hours per week.[99] Dr. Flavin opined that Plaintiff did not have limitations with lifting and carrying but that she was limited to the light level of exertion.[100] Dr. Flavin opined as well that Plaintiff's condition did not limit her access to services, and that the condition and its affect on the ability to work was permanent, and noted that the treatment plan was doctor visits, medication, and counseling.[101] Dr. Flavin opined that Plaintiff had no issues that required further evaluation.[102]

### h.    *Dr. Ankuta*

On October 5, 2021, George Ankuta, PhD, examined Plaintiff at the request of the Commissioner.[103] Dr. Ankuta reviewed the October 3, 2017 evaluation of Dr. Genthe as well as the September 2, 2021 treatment note written by ARNP Kristien Kehler.[104] Plaintiff reported that she suffered from fibromyalgia, carpal tunnel in both wrists, tennis elbow in both elbows, arthritis in her knee, chronic

---

[98] *Id.*

[99] *Id.*

[100] AR 370.

[101] *Id.*

[102] AR 371.

[103] AR 1505-1509.

[104] AR 1505.

1   stomach pain, PTSD, bipolar disorder, and anxiety.[105] Dr. Ankuta noted that on

2   mental status examination Plaintiff was poorly groomed with greasy hair, had

3   intermittent eye contact, had rapid speech which required effort to understand,

4   used simple language, had muted affect and depressed or manic mood, was able to

5   complete serial 7's and 3's with one error each, and was able to perform simple

6   math.[106] Dr. Ankuta diagnosed PTSD and bipolar II disorder and opined that

7   Plaintiff's prognosis was fair.[107] Dr. Ankuta rendered the following opinion:

> She has an adequate fund of knowledge. She demonstrated that
> ability to think abstractly. Her memory was adequate for recalling
> simple and perhaps complex instructions at work. Her attention and
> concentration were fair to adequate. She may have difficulty
> sustaining the pace of competitive work. She had an emotionally
> abusive childhood. She had an emotionally and sexually abusive
> marriage of 12 years. She has limited contact with her brother. She
> has one friend of 10 years that she is out of contact with for a few
> months after a dispute. She was awkward in her interaction with the
> evaluator due to emotional volatility and limited social skills. She may
> have difficulty functioning socially in a competitive work situation.
> She may have difficulty tolerating the emotional stress of competitive
> work.[108]

---

[105] *Id.*

[106] AR 1507.

[107] *Id.*

[108] AR 1507-1508.

DISPOSITIVE ORDER - 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

       *i.*    <u>PA-C Beck</u>

On February 22, 2022, Frank Weston Beck, PA-C, examined Plaintiff and completed an evaluation for the DSHS.[109] Plaintiff complained of fibromyalgia, knee pain in the right knee, carpal tunnel syndrome following carpal tunnel and ulnar nerve surgery, chronic abdominal pain with IBS, depression, anxiety, and PTSD.[110] On examination Plaintiff looked tired; walked with an antalgic gait; had reduced range of motion of the back, hips, and knees; had a minimally decreased grip strength bilaterally, had decreased sensation to light touch bilaterally, and had a flat affect.[111] PA-C Beck diagnosed Plaintiff with fibromyalgia of marked severity; carpal tunnel syndrome of moderate severity; generalized anxiety disorder of marked severity; PTSD of marked severity; and IBS of mild severity.[112] PA-C Beck opined that Plaintiff's fibromyalgia would affect her ability to sit, stand, walk, lift, handle, and carry; that her carpal tunnel syndrome would affect her ability to lift, handle. and carry; that her anxiety would affect her ability to communicate, understand, and follow directions; that her PTSD would affect her ability to communicate, understand, and follow directions; and that her IBS would

---

[109] AR 1614-1623.

[110] AR 1615.

[111] AR 1619.

[112] *Id.*

1  affect her ability to sit, stand, walk, and lift.[113] PA-C Beck opined that Plaintiff was

2  limited to sedentary work overall and that the limitation would last at least 12

3  months.[114]

4      3.    Analysis

5      Plaintiff argues that the ALJ erred by improperly rejecting all or a portion of

6  every medical opinion of record and formulating an RFC that was not specifically

7  supported by any medical opinion.  The Commissioner argues that the ALJ gave

8  good reasons to discount the opinions of the medical sources and that the ALJ

9  properly resolved conflicts in the record.  The Court disagrees with the

10  Commissioner.  While the Commissioner correctly argues that the RFC need not be

11  based on any specific medical opinion, Plaintiff is correct in her assertion that the

12  ALJ failed to adequately articulate his consideration of the supportability and

13  consistency of the opinions.

14      a.    *The ALJ's consideration of Dr. Genthe's opinions*

15  The ALJ articulated his consideration of Dr. Genthe's opinions as follows:

16  The opinion of Dr. Genthe was also considered (1F/4-5). This opinion
   is not supported by the doctor's examination that shows good hygiene,
17  normal speech, cooperative attitude, friendly behavior, normal
   thought content and thought process, normal memory, normal
18  calculations, and fair to good insight and judgment (1F/6-7). Further,
   his opinion of marked mental limitations is inconsistent with
19  examinations that show no depression, anxiety, or agitation; no acute

20

21  ───────────────

   [113] *Id.*
22
   [114] AR 1620.
23

distress; or only mildly abnormal affect (3F/5, 9; 5F/39, 46, 51, 61, 81, 153, 195, 272, 339). Therefore, this opinion is not persuasive.[115]

Plaintiff argues that the ALJ's reasoning is flawed for several reasons. First, Plaintiff argues that the ALJ erred in discounting Dr. Genthe's opinion that Plaintiff would have difficulty dealing with stress because the ALJ failed to consider that functioning when in a clinical setting is different than a work setting. Also, Plaintiff argues that the results of the psychometric assessment administered by Dr. Genthe support his assessed limitations and the ALJ did not consider the results of the psychometric assessment.  Plaintiff additionally argues that the ALJ did not properly articulate the manner in which the treatment notes that he cited are inconsistent with Dr. Genthe's opined limitations. The Commissioner counter argues that the ALJ did account for Dr. Genthe's opined limitation in dealing with stress by limiting Plaintiff to "low stress" jobs.  He also argues that the ALJ did not err in failing to consider the results of the psychometric testing because Dr. Genthe did not say that he relied on them to formulate the opined limitations. Additionally, the Commissioner argues that the "normal" mental status findings in the treatment notes cited by the ALJ are sufficient to support his reasoning.

The Court find the Commissioner's argument persuasive that the ALJ adequately explained that the treatment records he cited contained "normal" finding on mental status examinations. While the ALJ could have done a better job

_____

[115] AR 26.

of explaining the exact findings he found inconsistent, his language was sufficient to allow a reviewing court to understand the finding he found inconsistent. Additionally, the Court finds the Commissioner's argument persuasive that the ALJ did not err in considering that Plaintiff was able to function in a clinical setting. Plaintiff is correct that the ability to function in a clinical setting is not analogous to the ability to function in a work setting, but one's ability to function in a clinical setting is a factor to consider when assessing one's general ability to function, particularly in a situation such as Dr. Genthe's examination in which the patient is not familiar with the examiner. If Plaintiff's argument were to be credited, there would be little if any use for a mental status examination to be performed because its results would be of no value.

The Court, however, is persuaded by Plaintiff's argument that the ALJ did not address the results of the Personality Assessment Inventory (PAI) administered by Dr. Genthe when assessing the supportability of his opinions. The PAI is a test containing 344 self-reported questions whose questions address 4 separate scales and it is regarded by the American Psychological Association to be a valid and objective indicator of function.[116] "The PAI consists of 22 non-overlapping scales, including 4 validity scales, 11 clinical scales, 5 treatment

---

[116] American Psychiatric Association, *The Personality Assessment Inventory*, www.psychonet.apa.org. (last viewed November 19, 2024).

scales, and 2 interpersonal scales."[117]  For that reason, it is generally regarded as an objective test by medical professionals.[118]

When discussing the results of the PAI, Dr. Genthe noted that there was an implication that Plaintiff might have overreported symptoms but stated that even with that factor he considered the test to indicate a serious anxiety.  He said:

> The PAI clinical profile is marked by significant elevations across several scales, indicating a broad range of clinical features and increasing the possibility of multiple diagnoses. Given certain response tendencies previously noted, it is possible that the clinical scales may overrepresent or exaggerate the actual degree of psychopathology. Nonetheless, profile patterns of this type are usually associated with marked distress and, unless there is extensive distortion or exaggeration of symptomology, severe impairment in functioning is typically present.  The configuration of the clinical scales suggests a person with marked anxiety and tension. . .[119]

Based on Dr. Genthe's lengthy and detailed analysis of the results of the PAI, as well as its acceptance by medical professionals as objective evidence, the Court concludes that it was not possible for the ALJ to adequately address the supportability of Dr. Genthe's opinions without considering the results of the PAI.

The Court rejects the Commissioner's argument that the ALJ was not required to consider the results of the PAI because Dr. Genthe did not explicitly

---

[117] Cambridge University Press, *Handbook of Clinical Assessment, 17 – Personality Assessment Inventory*, www.cambridge.org

[118] *Id*.

[119] AR 366.

state that he considered the results when formulating his opinions. Dr. Genthe's detailed recitation of the results of the PAI and his interpretation of it were contained in the same report in which he rendered his opinions. The ALJ cited to the results of the mental status examination, which were also contained in the report, when considering the supportability, despite the fact that Dr. Genthe did not specifically state that he relied on those in formulating the opinions.

The Court finds it clear from the structure of Dr. Genthe's report that he formulated his opinions on the basis of his thorough interview with Plaintiff, the mental status examination, and the results of the PAI. It was error for the ALJ to not consider the objecting testing when addressing supportability, and the Court concludes that remand is warranted.

        b.    *The ALJ's consideration of Dr. Fife's and Dr. Ankuta's opinions*

The Court also finds that the ALJ failed to properly consider the consistency factor of these opinions. The regulations are clear that the ALJ is required to consider and articulate his reasoning both as to the supportability factor *and* the consistency factor.[120] The regulations are clear that a proper and thorough analysis of one of the two factors is not enough to overcome the failure to address the second.

The ALJ articulated the following reasoning in partially rejecting the opinions of Dr. Fife:

---

[120] 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785.

1

2          Dr. Fife provided an opinion that was also considered (5F/299). The
          portion regarding a social interaction limitation is not supported by
3          this doctor's examination that reveals no evidence of depression,
          anxiety, or agitation (Id.). While exposure to "lots of people" is not
4          clear, it generally implies a limited ability to interact with the public.
          The undersigned has accounted for this general implication by
5          including a limitation to occasional interaction with the public, which
          is consistent with symptoms of social anxiety and panic attacks as
6          well as flat affect (1F/2; 5F/214, 223, 302; 10F/7; 25F/16; 27F/24).
          Additionally, the doctor opined the claimant's bilateral carpal tunnel
7          syndrome would affect her ability to lift, handle, and carry for twelve
          months. This is not supported by the doctor's treatment notes that
8          shows significant improvement following treatment with no further
          follow-up required (5F/291). Further, this is inconsistent with
          improved hand pain and reports of crocheting (8E/2; 26F/16). Thus,
9          this opinion is partially persuasive.[121]

10          The ALJ then went on to articulate the following reasoning to support his

11  finding that the opinions of Dr. Ankuta were only partially persuasive:

12          The opinion of Dr. Ankuta is partially persuasive (8F/3-4). The portion
          of this opinion regarding difficulty with pace is not supported by the
13          examiner's findings that show the ability to think abstractly and no
          problems performing neuropsychological tests (8F/3). This is also
14          inconsistent with the claimant's reports of doing well in school,
          independently performing activities of daily living, and taking care of
15          her daughter as well as logical, linear thoughts and normal
          concentration (5E/2; 1F/3; 7F/101; 14F/7; 27F/81). The remaining
16          portions are supported by the examination that reveals intermittent
          eye contact, poor grooming, awkward social interaction, and emotional
17          volatility but otherwise adequate memory and concentration (Id.). It is
          also generally consistent with the claimant's reports of anxiety and
18          panic attacks and findings of abnormal affect (1F/2; 5F/302, 307;
          10F/7; 25F/16; 27F/24). As such, this opinion is partially persuasive.[122]

19

20

_____

21

[121] AR 26-27.

22

[122] AR 27.

23

1    Here, as was noted, the ALJ reasoned that Dr. Fife's examination did not

2    support a limitation in social interaction but ignored the fact that Dr. Ankuta

3    noted significant limitations in social interaction.  At the minimum, the ALJ was

4    required to consider the consistency of Dr. Fife's opinions with the evidence and did

5    not do so. Moreover, the ALJ failed to adequately articulate his reasoning as to how

6    a limitation to occasional contact with the public accounted for the limitations

7    opined to by Dr. Fife and Dr. Ankuta.

8    The ALJ's reasoning that the findings from the examiners' mental status

9    examinations showed only minor abnormalities is incorrect.  On examination by

10    Dr. Ankuta, Plaintiff was poorly groomed, was very awkward socially, and was, by

11    Dr. Ankuta's description, "emotionally volatile."[123] Plaintiff described to

12    Dr. Ankuta that she had limited contact with her family and had been out of

13    contact for months with her only friend following a dispute.[124]

14    Accordingly, the Court concludes that the reasons that the ALJ articulated

15    as to the consistency factor were not "good reasons" to discount the medical

16    opinions.  The Court concludes that remand is warranted for the ALJ to properly

17    consider the medical opinion evidence both as to the supportability factor and as to

18    the consistency of the medical opinions that Plaintiff suffers marked limitations in

19    social functioning.

20    

21    ───────────────

22    [123] AR 1507-1508.

23    [124] *Id.*

1             *c.*     *<u>The ALJ's consideration of the remaining medical opinions</u>*

2          Because the Court has remanded the case, it is not necessary to address the

3    remaining opinions. On remand, the ALJ is to better articulate his reasoning as to

4    the persuasiveness of the medical opinions.

5             4.    <u>Summary</u>

6          Because the ALJ failed to properly consider the consistency and

7    supportability of the medical opinion evidence, a remand for further proceedings is

8    warranted.

9    **B.    Plaintiff's Subjective Complaints: The Court finds the issue moot.**

10         Plaintiff argues the ALJ failed to properly his testimony. As discussed above,

11   the ALJ failed to properly consider the medical opinion evidence.  Because the

12   Court has remanded the case for consideration of the record as a whole, the Court

13   finds this issue is moot.

14   **C.    Remand for Further Proceedings**

15         Plaintiff submits a remand for payment of benefits is warranted. The

16   decision whether to remand a case for additional evidence, or simply to award

17   benefits, is within the discretion of the court."[125] When the court reverses an ALJ's

18

19

20

21   [125] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*,

22   761 F.2d 530 (9th Cir. 1985)).

23

decision for error, the court "ordinarily must remand to the agency for further proceedings."[126]

The Court finds that further development is necessary for a proper disability determination.

## IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 10 and 12**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 16th day of December, 2024.

*Edward F. Shea*
_____
EDWARD F. SHEA
Senior United States District Judge

---

[126] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke* 379 F.3d at 595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).